## No. 3013

## W. R. HIGH *v.* THE STATE.

1. MURDER—MANSLAUGHTER—"ADEQUATE CAUSE."—Of the four "adequate causes" for the "sudden passion" characteristic of manslaughter, the Penal Code, in Article 597, enumerates two as follows: 1, "An assault and battery by the deceased, causing pain or bloodshed;" and, 2, "a serious personal conflict in which great injury is inflicted by the person killed by means of weapons or other instruments of violence, or by means of great superiority of personal strength, although the person guilty of the homicide were the aggressor, provided such aggression was not made with intent to bring on a conflict and for the purpose of killing." But the preceding Article, 596, enacts that "an assault and battery so slight as to show no intention to inflict pain or injury" is not an adequate cause.

2. JUSTIFIABLE HOMICIDE IN SELF DEFENSE—"ATTACK."—Homicide in necessary self defense is justifiable when committed to prevent murder, maiming, or serious bodily injury (and certain other offenses); but "the attack upon the person of an individual, in order to justify homicide, must be such as produces a reasonable expectation or fear of death or some serious bodily injury." A person thus attacked is not bound to retreat, nor to resort to other means of prevention, before slaying his assailant.

3. SAME.—If the attack was not made with a deadly weapon, and the slayer, in resisting it, killed his assailant with a deadly weapon, a nice question is likely to arise as to whether the homicide was culpable or justifiable. See the opinion in extenso for hypothetical facts and considerations affecting this question, and for an exposition of the law in such cases.

35

4. SAME.—Among the conditions annexed by Article 570 of the Penal Code to the right of self defense in prevention of the offenses therein named, it is provided, that the killing must take place before the offense committed by the party killed "is actually completed,"—except in certain specified cases, among which are maiming, disfiguring, or castration, in which "the homicide may take place at any time while the offender is mistreating with violence the person injured, though he may have completed the offense."

5. MAIMING.—Article 507 of the Penal Code enacts that: "To maim is to wilfully and maliciously cut off or otherwise deprive a person of the hand, arm, finger, toe, foot, leg, nose, or ear; to put out an eye, or in any way to deprive the person of any other member of his body." A front tooth, though not specified in the first clause of said Article, is a "member of the body" as that phrase is used in the latter clause. When, however, as in this case, the evidence describes the tooth as a "corner tooth," a question of fact for the determination of the jury is raised, i. e., whether the tooth was or was not a "front tooth."

6. INTENT—PRESUMPTION.—The Penal Code, Article 50, provides that "the intention to commit an offense is presumed whenever the means used is such as would ordinarily result in the commission of the forbidden act;" and it is elementary law that, unless the contrary appears, a man is presumed to intend that which is the necessary, or even the probable, consequence of his acts.

7. CHARGE OF THE COURT—MAYHEM—"MISTREATING WITH VIOLENCE."—In a trial for murder it appeared that in a personal conflict between the defendant and the deceased the latter struck the former with his fist and knocked out a tooth, and there was evidence tending to prove that the deceased was in the act of again striking the defendant at the instant the latter shot and killed him. *Held* that the trial court erred in omitting and refusing to give in charge to the jury the law of mayhem, and in refusing to submit to the jury the question of fact whether there had been a cessation of violence by the deceased when the fatal shot was fired, or whether he was still "mistreating with violence" the defendant.

8. ASSAULT—"VIOLENCE."—To assault a person is to "mistreat" him, but a mere assault is not always violence within the meaning of sub division 6 of Article 570 of the Penal Code.

9. CORPUS DELICTI—EVIDENCE—PRACTICE.—Note the comment of this court upon the unsatisfactory proof of the corpus delicti, when it is apparent that more definite evidence on the matter might have been adduced by the prosecution.

APPEAL from the District Court of Smith. Tried below before the Hon. F. J. McCord.

The indictment in this case charged the accused with the murder of Louis McDougald, in Smith county, Texas, on the twenty-eighth day of July, 1888. The trial, which was had on the twenty-fourth day of September, 1888, resulted in the convic-

tion of the appellant for manslaughter, with a term of three years in the penitentiary assessed as penalty.

Nathan Stevens was the first witness for the State. He testified that he lived on the place of Mrs. Humphreys, in the city of Tyler, Texas, and lived on that place in July, 1888. Prior to his removal to the Humphreys place, the witness lived near the house of Mrs. Stewart, which house was in the eastern part of the said city of Tyler, and near Mr. Palmer's house. Mrs. Stewart had two daughters and one son who, together with the defendant, lived with her. About a month before the killing of McDougald, the defendant came to the house of witness's mother for the purpose, as he said, of getting her to do some washing for him. On that occasion he said that he and Mrs. Stewart had "busted up;" that Louis McDougald "busted" them up, and that he intended to kill Louis McDougald for doing so. The witness was unable to say how long the defendant and Mrs. Stewart lived together.

Cross examined, the witness said that he was past sixteen years of age, and would attain his seventeenth year on the fourth day of July, 1889. He lived with his mother, Martha Stevens, in a house on the Texas & St. Louis Railway, that belonged to Mrs. Humphreys. He was at present in the employ of the compress company, but could not remember how he was employed, or at what, or for whom he worked in August, 1888, except that for awhile he worked on the streets to liquidate a fine. His said service on the streets lasted about ten days. The witness could neither read nor write, nor could he now designate the month in which the killing of McDougald occurred. The witness had no particular employment during the month of July, 1888, but worked at such jobs as he could get. He could not say that he did much work of any kind during July and August, 1888, except, as stated, the work on the streets, which he was required to do in payment of a fine assessed against him for fighting. The witness was not a mere town loafer, nor did he belong to the Tyler "crap shooting gang." Pressed to state the character of his employment during July and August, 1888, the witness said that he worked at anything for anybody who gave him work to do and had the money to pay him for doing it. He cleaned yards and removed the trash from the front and back yards of quite a number of people in Tyler during the said two months, but could not give the name of any one person for whom he worked during that time.

The witness stated that the first time he repeated to anybody the threat he heard uttered by the defendant against McDougald was when he stated it to the grand jury. Except the said grand jury, the witness told nobody about the said threat, except the district attorney, Mr. Alston, and Attorney General Hogg. It was after he testified before the grand jury that the witness talked to the district attorney and Messrs. Alston and Hogg. He was not taken before the grand jury by any person. Mr. Robert Bennett told the witness that Mr. Alston said for him, witness, to go before the grand jury. The witness mentioned the threat uttered by defendant to Mr. Bennett on the day after the defendant made it. Mr. Bennett then knew, about the said threat, as he was at the witness's mother's house on the evening that defendant made it. To the best of the witness's recollection the conversation in which the defendant told his, witness's, mother that he was going to kill McDougald for breaking him up with Mrs. Stewart, occurred on Monday morning, but he was unable to say on what Monday morning it was, whether in June, July, August or September, but he knew that it was in 1888, and that it was more than three weeks prior to this trial. The witness was unable to locate the time more particularly than as stated, but it was a fact that defendant said that he was going to kill Louis McDougald. Not only did witness's mother tell him that defendant said so, but witness heard the defendant say it on the said Monday morning. Witness got home from his work on that morning just after the defendant went into his, witness's, mother's house. When witness stepped into the house he found the defendant in there. His mother then asked witness, "Do you know Louis McDougald?" The witness replied that he did, and his mother asked him who Louis McDougald was. Witness replied that he was a hack driver, and his mother said: "Mr. High says that he is going to kill Louis McDougald." Defendant, who was present and heard what was said, remarked: "Yes, I am." The witness was then standing in the door; his mother was washing, and the defendant was in the house. The witness had just finished cutting some wood for a lady who lived near Mrs. Humphreys's house, and had gone home. It was then about or a little after ten o'clock in the morning. He did not know the name of the lady for whom he cut the wood. She engaged him on the previous evening, and he began work on the wood about seven o'clock on that morning. He cut it into two foot lengths,

and it could not, at least did not, take him longer than until ten o'clock to do it. He then went home and found the defendant, who had arrived but a few moments before. Witness was on his way home, was in sight, and saw defendant when he entered the house. The house of the witness's mother contained two rooms, a large and small one. The witness, his mother and the defendant were in the large room when defendant stated that he was going to kill McDougald.

The cross examination of this witness was protracted to great length, to the evident confusion of the witness, as to minor details of the interview between his mother and defendant at the house of the former on the morning of the defendant's visit when he uttered his threat to kill the deceased. As elaborated by the cross examination, the statement of the witness on the main point was to the effect that he left his wood cutting work about ten o'clock on a certain morning— Monday, he thought — about a week before the homicide and went home; that just before he reached his mother's house, he saw the defendant enter it; that when he reached the house, he stepped in the door and found the defendant sitting in a chair in the house talking to his, witness's, mother, who was washing clothes; that his mother then asked witness who Louis McDougald was; that he replied that the said McDougald was a hack driver, and asked her why she asked the question; that she replied that the defendant had just said that he was going to kill Louis McDougald; that defendant remarked: "Yes, I am;" that he then asked his mother what the defendant was going to kill McDougald for, and she replied, in defendant's hearing, that defendant said he was going to kill McDougal because he had broken up him, defendant, and Mrs. Stewart, and because McDougald once came to the house drunk, and kicked open the door, and was going to keep him, defendant, and Mrs. Stewart broken up. The witness stated further that Mr. Bennett came into his mother's yard during the time that defendant was in the house, and about the time that the conversation between defendant and his mother occurred. Bennett came to the door and spoke to witness about helping him to catch his horse Witness excused himself upon the plea of sickness, which was a mere subterfuge. Bennett did not speak to defendant nor defendant speak to him, nor did defendant advise or request witness to help Bennett catch his horse. The witness next saw defendant, after the said morning, on the night of but after

the shooting, when the officers were taking him to jail. Wit-
ness went to the Kansas & Gulf Short Line railroad depot on
the fatal night on Will Davis's wagon. He had not reached
the said depot at the time of the killing, but heard the shot,
and afterwards saw the defendant en route to jail in custody of
officers. The witness had never heard, from any source what-
ever, that the hack drivers who frequented the depot for "fares"
had "it in them for the defendant" because he excluded them
from the platform; nor did the witness go to the said depot on
that night because he expected trouble between defendant and
and the hack drivers, and wanted to see it.

Martha Stevens, the mother of the preceding witness, was
the next witness for the State. She testified that, while unable
to locate the date of the killing of Louis McDougald, she could
remember the circumstance of his death as reported to her. A
short time prior thereto the defendant came to the house of the
witness to get her to do some washing for him. As he was
still in her debt for washing she had done for him long prior to
that time, the witness declined to take it, reminding him that
he still owed her for such service. Defendant replied that he
would pay the bill as soon as the pay car of the railroad for
which he was working came along. Witness again declined
to take the washing, and asked him where Mrs. Stewart was.
He replied that a hack driver—mentioning no name—had re-
cently come between him and Mrs. Stewart and broken them
up, and that he did not live with Mrs. Stewart or at her house
any longer. He said nothing more to the witness about Mrs.
Stewart, nor about the hack driver, nor did he say what hack
driver it was that broke him up with Mrs. Stewart.

The next witness for the State was John Jessup. He testified
that his active employment was in the transfer business, but
that he was also studying law under Judge Duncan. His
"transfer" business consisted in transporting passengers to and
from the railroad depots, and hauling baggage, trunks, etc.
He ran a hack and baggage wagon in connection with that
business. He knew the defendant and the deceased, and was
present and witnessed the killing of the latter by the former.
The killing occurred at the depot of the Kansas & Short Line
Railway, in the city of Tyler, Texas. The witness and other
proprietors and drivers of hacks reached the depot about nine
o'clock on the fatal night. One of the depot rules in force at
that time was that hack drivers, in drumming for passengers,

should not stand or walk upon the main part of the depot plat-form, but should confine themselves to the edge of the same. The train pulled up to the depot a short while after the witness reached it, at which time some of the hack drivers were off, and a few, including Louis McDougald, were on the platform. About that time defendant pushed back those who were on the platform. McDougald said to defendant: "Don't push me. Ask me like a gentleman, and I will get back." He then added: "Don't push me; if you do I will knock a lung out of you." Defendant then cursed McDougald. McDougald said to him: "Don't you curse me." Defendant then pushed McDougald again, and McDougald struck him, and knocked him against a car, whereupon the defendant fired. McDougald then turned, walked off up the railroad track and around the depot, got on his hack and drove to Doctor Hicks's office. The witness was looking at McDougald when he struck the defendant. Defendant struck at McDougald. McDougald then put his right hand to defendant's mouth and struck him with his left hand. Mc-Dougald did nothing more to defendant after striking him. He was then standing on the platform. It appeared to the witness that, when shot, McDougald was leaning somewhat to-wards the cars. He was not facing the defendant, but seemed to be watching both the defendant and the chance of obtaining passengers. The witness was unable to say whether or not McDougald was talking to anybody at that time. Defendant and McDougald, when the latter struck the former, were at a point near the center of the platform. The blow knocked the defendant against one of the cars, but not under the car. From his position against the car, defendant faced north, his face but not his hands being in the view of the witness. McDougald at that time was not facing defendant, but was evidently watching him to intercept any attempt on the part of the defendant to get in his rear. After receiving the shot, McDougald walked around the depot, got on his hack and drove to Doctor Hicks's office. Defendant followed McDougald a short distance, exclaiming: "I will kill the son of a bitch!" He then had his pistol in his hand. The witness was near McDougald when he struck de-fendant, and knew that McDougald then had nothing in his hand, and used only his clenched fist. The witness knew Bob Wombledoff, and saw him soon after the shooting. Wombledoff came to the platform through the door of the freight office about two minutes after the shot was fired, and after McDougald had

passed around the depot to his hack. The freight office door was between thirty and forty steps from the point on the platform where the shooting occurred. When he got on his hack, McDougald went to Doctor Hicks's office via Ferguson street. Witness went to town via Erwin street, and thence over Bois d'Arc street to Doctor Hicks's office. About the time he reached Doctor Hicks's office, McDougald hallooed to him. Witness asked him how he was, and he replied that he was pretty badly hurt. Witness then got McDougald into Doctor Hicks's office. Mrs. Hicks said that the doctor was then at the barber shop. Witness then went to the barber shop and found Doctor Hicks, and thence, by direction of Doctor Hicks, he went to the hospital and summoned Doctor Smith, the hospital physician. This occurred on Saturday night, soon after the shooting. Witness next saw McDougald between three and four o'clock on Monday evening, and next saw his body a few minutes after death, which occurred about six o'clock on the said Monday evening. Witness supposed that McDougald died from the effect of his wound, which was in the stomach.

Cross examined, the witness said that he had no stones in his hands or pockets at the time of the shooting, nor did he see any stones about the place of the shooting. The witness was driving his baggage wagon at the time of the shooting. He had been driving one of his vehicles about six months, but had been engaged in the transfer business about two years. He had known McDougald about two years at the time of his death. McDougald was twenty-two or three, or perhaps a few years older; would weigh between one hundred and seventy-five and one hundred and eighty-five pounds, and was a correspondingly strong man. He was a peaceable man—not what is generally understood as a "fighter"—but would not submit to imposition at the hands of anybody. The witness's acquaintance with McDougald had been intimate during the period of their acquaintance. There were two hack drivers and the transfer men at the depot at the time of the shooting. Bob Jessup, Homer Price, Will Davis, and Tom Beauchamp, the son of the hotel keeper, were also there. Tom Beauchamp and Bob Jessup went to the depot in the witness's wagon, Beauchamp driving. Witness went to the depot with McDougald, as he wanted to discuss a matter of business with him. The train reached the depot about ten minutes later than the witness and McDougald did. The several parties spent the said ten minutes walking

about the platform, talking and laughing, as was their custom. Witness did not see the defendant until the train pulled in. The witness did not then know what the business of the defendant was, but thought he was the depot porter. He afterwards learned that defendant was night watchman at the depot. The hack drivers and transfer men had been notified that they would not be permitted to obstruct the platform. They were not required by that notice to keep entirely off the platform, but to keep remote enough from the usual passway to give passengers ample room to get on and off the cars. Officers were generally present to enforce the rule. When officers were not present, the hack drivers and transfer men did not pretend to observe the rule. Witness and McDougald were both on the platform, but were near the edge when defendant appeared. The platform was about five feet wide. Several parties were standing on the car steps when the train stopped, but if witness saw Conductor Will Herndon on that night he did not remember it. It was quite dark on the night of the shooting, and witness remembered seeing no other lantern on the platform than the one carried by the defendant. After the arrival of the train, the platform was somewhat illuminated by the car lamps. The witness, the deceased, Bob Jessup, Homer Price, and Tom Beauchamp were about opposite the car steps at the time of the shooting. The hack men and transfer men had never had any trouble with the railroad companies, and none with the town officers so far as the witness knew. The said officers had been strict about enforcing the rule, and the hackmen had "kicked" about it.

Continuing, this witness on cross-examination said that defendant pushed others back from where they were on the platform, before he reached and pushed McDougald back. He pushed one or two parties back before he reached the witness. He then pushed the witness, and the witness reluctantly got back. He then passed to and pushed Will Davis back, and then reached and pushed McDougald with unusual violence. McDougald said to him : "Don't shove me back. Ask me like a gentleman and I will get off, but, if you push me, I will kick a lung out of you." Defendant then proceeded to curse McDougald. He could not curse loud, but he cursed remarkably fast. McDougald then put his right hand to defendant's face as if to stop the oaths, and said to him : "Don't you curse me." Defendant then knocked McDougald's hand away, and Mc-

Dougald, using his left hand, struck the defendant in the region of the mouth, and knocked him against but not under the car. Witness did not see defendant's mouth bleeding just after the blow, but saw a scratch on his face. He did not know that the blow broke out any of defendant's teeth. McDougald had as good use of his left as of his right hand. Witness was unable to say whether or not, had the car not caught him, the defendant would have fallen as a result of the blow. He leaned against the car for a moment or two, apparently expecting and preparing to avoid another blow, and then he fired upon and shot McDougald. The defendant's pistol did not fire instantly after defendant was knocked against the car, but fired within a very few seconds thereafter. A long enough time elapsed between the blow and the shot to enable the witness to "take in" the situation. The ball took effect in McDougald's bowels. McDougald then walked around the north end of the depot to his hack. Defendant followed behind McDougald, and witness followed and overtook defendant. A few words, which witness could not now recall, passed between the defendant and himself. The words, however, were not angry ones. Witness did not remember that defendant asked him what he was following him for. If Bob Wombledoff was under the front car when the shot was fired, the witness did not know it. He did not see Wombledoff until, as before stated, after the shot was fired, he saw him come out of the freight office. Wombledoff then passed witness, going from McDougald, and defendant was then going towards McDougald, who had gone around the depot towards his hack. The witness supposed that it would take the defendant a few seconds to straighten up after receiving the blow, and about a sufficient length of time elapsed for him to do so before he fired. He was standing straight when he fired. The witness denied that he had ever said that defendant got up shooting. Defendant was about forty-five years old, and was as heavy and strongly built as McDougald, but not so tall.

The testimony in chief of Bob Jessup, the next witness for the State, was a substantial corroboration of the testimony of John Jessup as to the circumstances immediately attending the shooting, except that, according to this witness, the defendant, immediately after McDougald threatened to kick a lung out of him if he shoved and cursed him, raised his hand as if to strike McDougald, whereupon McDougald warded off the hand, and

struck him the blow which preceded the fatal shot by a few·
seconds.  On his cross examination, this witness stated that·
John Jessup was the only one of the hack drivers who was on
the platform.  McDougald was standing near the platform,
with one foot on it.  Defendant pushed McDougald much more·
roughly than he did either of the other parties when he ordered
him to step back.  When, in the course of the transaction as·
detailed by John Jessup, McDougald told defendant not to
curse him, defendant raised his hand as if to strike McDougald.
McDougald warded off that blow, and struck defendant in the·
face or neck with his right hand.  The witness thought, but·
was not certain, that McDougald raised his right hand towards
defendant's face before striking the blow.  The blow, which
was not a very severe one, staggered defendant somewhat but
did not knock him down.  The fatal shot was fired within a
very brief space of time after the blow was struck.  After he
received the wound, McDougald ran towards the north corner·
of the depot.  Defendant followed, and John Jessup followed.
behind defendant.  Witness followed behind John Jessup, and.
called to him to stop.  He (John Jessup) and witness stopped
immediately south of the depot hall door.  Witness did not ob-
serve defendant's mouth after the shooting.  Policeman Brown·
at the depots of the two other railroads told the witness and
other hackmen about the rules they would be required to ob-
serve when meeting trains, but said nothing about the rules as
applied to the Kansas & Gulf Short Line.  The witness knew·
of no understanding among the hackmen to take possession of
the platform on the fatal night.  He knew nothing of any per-·
son having stones about them that night.

Walter Price testified, for the State, that he was present and
saw the shooting of McDougald by the defendant.  About the·
time that the train stopped, the defendant came up to the hack.
drivers, and, shoving each one back, told them to "stand back."
He pushed McDougald more roughly than any other of the boys,
and McDougald said to him:  "Don't shove me, or I will knock
a lung out of you."  Defendant, who could not talk very loud,
muttered some oaths, and thrust his hand into McDougald's.
face.  McDougald then struck defendant and knocked him.
against a car, when defendant drew his pistol and fired the·
fatal shot.  McDougald then fled, followed by defendant.
Reaching his hack, McDougald got on it and went to town..
Witness, who was temporarily driving a hack for Taylor &·

Loftin, went to meet the Kansas & Gulf Short Line train on the night before the shooting. He reached the depot on that night, W. Medlin being with him, some minutes before McDougald reached it with his hack. At that time no person but defendant was on the platform. Just as McDougald drove up, defendant said: "I will shoot that hackman." Witness supposed that he was speaking of McDougald. He made no demonstration then towards executing that threat. On his cross examination, the witness said that no person other than himself, Woldert Medlin and defendant, were on the platform on the night before the tragedy when defendant said that he would shoot that hackman. Witness had since tried to recall that matter to Medlin's recollection, but Medlin now claimed not to have been at the depot on the night before the shooting, and never to have heard defendant make the remark quoted. About a week after the killing, the witness told John Jessup of what defendant said on the night before the killing. John Jessup met and asked him what transpired at the depot on the night before the killing; or, rather, if defendant did not say something about McDougald. The witness did not think that the blow which McDougald inflicted upon the defendant was any more violent than was the "shove" which defendant gave McDougald. The witness did not know that McDougald's blow knocked out any of the teeth of defendant, but witness saw the defendant, when being taken to jail after the shooting, directing somebody's attention to his teeth. Witness did not think that the blow inflicted by McDougald knocked the defendant against the car. It staggered him somewhat, and he then leaned against the car for a brief space of time, and then drew his pistol, fired and shot McDougald. Defendant passed his hand to and from his breast just before he fired, and the witness thought he drew his pistol from his breast. The shot was fired very soon after the blow was struck. Witness knew of the rule which excluded hackmen from the platform on the arrival of trains, but knew of no trouble between the hackmen and the officers on account of it. He knew that the hackmen quarreled among themselves at the depot, and he knew that Hackmen Halley and Holmes were once fined for going upon the platform.

On further cross examination the witness explained the circumstances under which the conversation with defendant occurred on the night before the shooting. He stated that he had

not been driving to the depot recently, and on his arrival he asked defendant if hackmen were allowed on the platform. This was just before McDougald arrived with his hack. To witness's said question the defendant replied: "No, and I will shoot that hackman if he comes on this platform." He said nothing about shooting the witness if he, witness, got on the platform. The witness did not then know that the defendant was a depot watchman. Witness had no further conversation with the defendant on that occasion. Woldert Medlin went with witness on the hack to the depot on that evening. It was after the shooting when witness first told John Jessup about the said conversation with defendant. He never did tell McDougald about it, nor did he ever tell any of the hackmen that they were liable to get shot if they went on the platform.

The State rested.

John Long was the first witness for the defense. He testified that he was at the Kansas and Gulf Short Line depot on the night of the shooting, and witnessed all that occurred at the time. Witness went to that depot to get the baggage of Mr. Tom Smith, whom he knew was on the train and would get off at the said depot. He reached the depot some time before the train arrived, and was there when the hackmen got there. Among others he saw McDougald, whom he did not personally know, and also saw the two Jessup boys, all of which parties, like others about the depot, were promenading the platform when the train pulled in. When the train came to a stop, the hackmen crowded the platform in front of the car steps, and from that point "cried" their vehicles. They so crowded the platform that the witness was unable to reach the car to get Mr. Smith's baggage, and passengers getting off encountered great trouble in pushing their way through them. While the witness was waiting for an opportunity to press his way through the hackmen, the defendant came up and told the hackmen to make way for the passengers. McDougald turned to defendant and said to him: "Speak to me like I was a gentleman, you d—d son of a bitch, and don't shove me, or I will knock a lung out of you." McDougald then struck the defendant a blow which knocked him under a car, and as soon as defendant could regain his feet he fired and shot McDougald. Defendant and McDougald were both on the platform when McDougald knocked the defendant down. No pushing from the platform of hackmen or anybody else was done by the defendant before or at

the time of the shooting. The witness was quite close to the parties when the blow was struck by McDougald, and when the shot was fired by defendant, so close, in fact, that his face was powder burned by the discharge of the pistol. Witness could not say how far the defendant was knocked by McDougald, but he straightened up about three feet distant from where he re- ceived the blow. His body fell partly across the rails and be- tween the forward and rear trucks, and "sorter" under the car. The defendant did not strike nor attempt to strike McDougald before McDougald struck him. Witness had known defendant for fifteen or twenty years, but could not say that he was ac- quainted with his reputation for peace and quietude. The wit- ness left as soon as the shot was fired, and did not observe the condition of defendant's mouth or face.

Cross examined, the witness said that he reached the depot between twenty and thirty minutes before the train arrived. He went to the depot to meet Mr. and Mrs. Tom Smith. He went in his buggy, which he left at some distance from the depot. After going to the steps where the train usually stop- ped, and remaining a few minutes, he went to a point on the platform where the defendant and other gentlemen were en- gaged in conversation. They were in the door of the depot. The witness did not know Bob Wombledoff, and could not say whether or not he was one of the parties who were then talk- ing with the defendant. The door of the baggage room was twenty or thirty feet distant from where defendant and the said parties were sitting. Witness, after telling defendant he had come to meet Tom Smith and his wife, walked to the end of the platform, and there waited for the train. When the train came in and the hackmen crowded the platform in front of the steps, the witness did not tell them that he wanted to get to the car. Witness was standing on the platform behind the hackmen when the defendant came down the platform to where they were. The said hackmen were standing in a circle around the car door. McDougald was the first and the only man that defendant spoke to at that time or place. If he pushed anybody he did it elsewhere, and at another point. De- fendant used no force whatever on McDougald prior to the shooting. He merely touched him with his hand and said: "Stand back, and let the people get off." As a matter of fact the witness did not know that defendant even touched McDougald when he told him to stand back. The platform was not above

six inches from the ground.   The bottom of the cars was about two or two and a half feet from the rails.   Defendant, when struck by McDougald, fell backwards off the platform, and the larger part of his body went under the coach.   When defendant and McDougald met, McDougald was on the platform at least two feet from the outside edge, and defendant three and a half feet from the inside edge.   Defendant's head did not strike the coach when he fell.   Witness could not estimate the length of time that elapsed between the blow and the shot, but defendant got up remarkably quick and fired immediately.

On further cross examination the witness said that he was looking at McDougald when he received the shot, and that at that particular time McDougald was looking at defendant. Witness did not know how the ball struck McDougald.   He did not think at the time, judging from the way McDougald went off, that he was hit at all.   Witness thought that McDougald, when shot, was facing defendant, but he could not swear that McDougald was not standing with his left side towards defendant.   McDougald made no effort to strike defendant a second blow.   When the shot was fired McDougald turned and fled. Defendant followed him eight or ten steps, with his pistol in his hand, but stopped when called by the crowd.   He said nothing about shooting or killing McDougald when he started in pursuit, nor while he was following him.   The witness denied that he ever talked with Press Taylor about this case, or that he ever told Taylor or anybody else that he was not at the depot at the time of the shooting.

W. R. Herndon testified, for the defense, that he was the conductor on the train that "pulled in" at the depot at Tyler at the time of the shooting of McDougald.   About the time that his train stopped, the witness heard a voice exclaim: "Don't shove me or I will knock a lung out of you."   Witness then got off the car and stood by the steps with his hand on a railing. About that time McDougald came to the steps and got a valise. He then walked to and knocked defendant down, and defendant, as soon as he straightened up, fired and shot McDougald. The witness got off the train to help the passengers off, and was standing on one side of the car steps, while his porter was standing on the other.   A line of hackmen were about the car door when the defendant came up.   The witness did not hear defendant say anything before he was struck by McDougald, nor did he strike or attempt to strike McDougald, so far as the

witness could or did see. McDougald struck defendant full in the face, and defendant fell under the car, his body striking the car, as it fell. Witness saw defendant just as he regained his feet and fired the fatal shot. At the report of the pistol McDougald turned and fled, and, as he started, he put his hand to his side, and the witness, thinking he was going to shoot, went into the depot building. Both the defendant and McDougald were south of witness, and a lady was standing between witness and defendant when the defendant fired. Defendant's business at the depot was to clean cars and keep hackmen off the platform. Witness had had trouble with the hackmen in attempting to keep them off the platform, and had complained of them to Policeman Wiley. John Jessup was at the depot at the time of the shooting, but witness did not remember seeing any other of the hackmen. To the knowledge of the witness the defendant did not strike or strike at McDougald just before McDougald struck him. McDougald was the only hackman who was standing well on the platform when the train reached the depot.

Cross examined, the witness said that the first of the difficulty he heard or saw was the remark of McDougald to defendant: "Don't shove me, or I will knock a lung out of you." Immediately after saying those words McDougald advanced to the car steps, took a valise from a passenger who was getting off, took one step towards the platform and struck defendant, knocking him down and under the car. Defendant's feet only went under the car when he fell. The defendant's vocal powers were so defective that he could only speak in a whisper, and witness could not have heard him whisper at the time of or just before the difficulty, because of the noise prevailing on the platform. At the time that the fatal shot was fired, McDougald was standing with one arm drawn back in a striking attitude, and, the witness thought, with his fist doubled up. He was not then nearer defendant than five or six feet, and could not have reached him by striking. Defendant did not fall entirely down on being struck by McDougald. He fell angling, with one foot under the car. The blow stricken by McDougald was a severe one, and it knocked the defendant a distance of six or eight feet.

Oscar White, the train porter referred to by the witness Herndon, testified for the defense that, when the fatal shot was fired, he was standing by the car steps on the opposite side from

Mr. Herndon, holding a lantern, and assisting the passengers to get off the train. The train passed the hackmen on the platform, a short distance from where it stopped, and the hackmen followed the train to the stopping point and then crowded the platform opposite the steps, shouting for passengers and baggage. Defendant, who, when the train passed him, was standing at the train crossing, walked to the point where the hackmen were standing, and told each, as he reached them, to get off the platform. McDougald was the third man he reached and told to get off the platform. McDougald answered him by saying: "Don't shove me, or I will knock a lung out of you." Defendant replied: "I have orders to keep you off the platform. I did not shove you, but if you get on this platform again I will shove you." McDougald then got back on the platform and put his hand in defendant's face. Defendant pushed it aside, and McDougald struck him in the face and knocked him backwards, a distance of five or six feet. Defendant saved himself from falling by catching to some attachment of the car, and, as soon as he straightened himself, he fired and shot McDougald. McDougald then put his hand to his stomach and ran. Defendant followed to the steps of the second class car, and then returned. Witness met the defendant on his return from the pursuit. He did not call witness's attention to his face or mouth, but showed him a tooth which he had in his hand. Witness then saw a red spot on defendant's cheek, but did not observe that his mouth or face was bleeding. McDougald, when the shot was fired, was facing the defendant, with his right hand drawn back in a position to strike.

Cross examined, the witness said that defendant did not fall under the car. He did not fall at all, having seized a car attachment, which enabled him to keep on his feet. Defendant did not shove any of the hackmen when he told them to get off the platform. He merely placed his hand on them and told them to get off. All of them did so without objecting, until McDougald was reached. Defendant put his hand on McDougald in the same manner that he did on the others, and told him to get off the platform. McDougald took one foot off the platform, and said to defendant: "Don't shove me, you son of a bitch, don't shove me, or I'll kick a lung out of you." The witness was about ten feet distant from defendant when the shot was fired, and five or six feet from McDougald. McDou-

gald's fist was doubled when the shot was fired, but witness was unable to say whether or not in was his intention to strike defendant again. Witness did not observe the bruise on defendant's face immediately after defendant's return from his pursuit of McDougal just after the shooting. Defendant was then showing him and Express Messenger Smith a tooth which he said McDougald knocked out of his mouth. Defendant fired the fatal shot as soon as he recovered his equilibrium. McDougald did not advance upon defendant after striking him, nor did defendant advance upon McDougald any further than was necessary for him to straighten himself on his feet. Witness saw nothing in McDougald's hands when he struck the blow. He had just put down the valise which he had taken from the hands of a passenger, and was quarreling with the defendant when he put it down. Witness did not see Mr. Long, and did not know whether or not he was at the depot on that night. He saw John Jessup, but did not remember seeing Bob Jessup or Walter Price.

W. H. Finch was the next witness for the defense. He testified that he was a member of the Tyler police force, and was the officer who, soon after the shooting, arrested the defendant. He found the defendant in a railway coach at the Kansas & Gulf Short Line round house. Defendant's mouth was bleeding when witness arrested him, and, soon after his arrest, the defendant took a tooth from his pocket and showed it to witness. He then opened his mouth and showed the witness the place from which in had been knocked. The tooth and mouth indicated that the tooth had been recently knocked out. When witness placed defendant under arrest and told him to go with him to jail, defendant requested witness to wait with him for a few minutes until the return of Mr. Wombledoff, who had gone to the hospital to get him some medicine. John McCullers and Butler came to the coach while the witness had the defendant. Witness had known the defendant about nine years, during which period his reputation for peace and quietude was good.

Cross examined, the witness said that he arrested the defendant, he thought, within twenty minutes after the shooting, and certainly not longer than thirty minutes. When he stepped into the coach where the defendant was, defendant merely remarked that he would surrender, and requested witness to wait with him a few minutes until Wombledoff got back with

the medicine. Witness had the tooth mentioned in his hand, and saw from its condition that it had recently been removed from a mouth. He then raised defendant's lip and saw a place in his mouth from which a tooth had been recently removed. He could not tell from the appearance of the mouth and tooth whether the tooth had been pulled or knocked out. The witness reiterated that the defendant's reputation for peace and quietude was good so far as he was acquainted with it. The witness did not know, nor had he ever heard, that the defendant was a quarrelsome, overbearing man. He considered the defendant a man of average strength, and did not regard him as decrepit or unsound.

Robert Wombledoff was the next witness for the defense. He testified that he was car inspector for the Kansas & Gulf Short Line Railroad, was stationed at Tyler, and, at the time of the tragedy, was under the baggage car just behind the front truck, inspecting it. Witness heard the pistol shot and got from under the said car, and about the time he got on his feet McDougald ran north between him and the depot, and passed around the depot building. Witness stood near the baggage car for a minute or a minute and a half, and then walked down the platform and met the defendant, whom he told to go into the car and stay there. About that time Doctor Smith or Mr. Hensley told witness that Mr. Clark wanted him, witness, to go to the hospital to get some medicine. Witness then turned to defendant and again told him to go into the car, and to stay in there until he got back from the hospital, when he would go with him to town. The witness did not then observe the defendant's mouth, but, on his return from the hospital, the defendant called his attention to his mouth, which was bleeding, and defendant took a tooth from his pocket and showed it to witness. Finch was then in the coach with defendant. When witness and defendant met just after the shooting, defendant said: "I had to do it." Defendant had his pistol in his hand at that time, and remarked that he was going to surrender himself.

On cross examination, the witness said that, besides working under him (witness) as a coach cleaner, the defendant was depot night watchman,—a regular peace officer. The witness advised the defendant to go into the coach just after the shooting because of the great excitement that was prevailing at the depot. The point under the baggage car where the witness was when the shot was fired was about a car length and a half from

the point where the shooting occurred. Witness did not hear any of the conversation which preceded the shooting. The shot was the first thing which indicated an unusual disturbance on the platform, as heard by the witness. Just as the witness got out from under the baggage car, a person whom he took to be McDougald, but whom he did not positively know, ran north between him and the depot building. He did not see the defendant until he, witness, left that point and walked down the platform. Defendant was not then running after or towards McDougald, nor, so far as the witness knew, had he been pursuing McDougald. The point on the platform where witness met defendant was twenty-five or thirty feet distant from the point where the shooting occurred. Defendant was standing still, with his pistol in his hand, when witness reached him. He said that "he had to do it." About that time several hack drivers came up the platform towards witness and defendant, and witness asked them what had happened. One or more of them replied: "High has shot McDougald." Just before this, some of the hack drivers said: "We are not going to let any d—d railroad son of a bitch do us that way," and witness then went to Conductor Herndon and asked him for a pistol. John Jessup was one of the hackmen who made the remark stated. The witness did not go into the baggage room, but went into the depot just before he saw defendant. From the depot he went to the platform and met the defendant. Witness asked Herndon for a pistol when the hack drivers rushed up the platform saying they would not let the d—d railroad sons of bitches do them that way. He, witness, did not call to defendant: "Kill the d—d sons of bitches!" He did not recollect that, when he met defendant, he said to him: "Stand up to them; we will fix them when I get my gun." He would not swear, however, that he did not make such remark to defendant. The witness's purpose in applying to Mr. Herndon for a pistol was to get a weapon with which to defend himself, as, judging from the temper of the hackmen, as indicated by their conduct and remarks, he did not feel safe. The witness was not trying to aid defendant, but, as the hackmen denounced or cursed the "d—d railroad sons of bitches," he did not know what they might or might not attempt to do to him, and he wanted to prepare himself for defense. About the time the train was pulling in, the witness stepped out of the depot, and saw defendant on the platform, talking to some person whom he could not now name.

Witness told the defendant to give him his torch and red light, and that he would inspect the cars when they stopped. That was but a few minutes before the shooting. Witness knew one or more Longs, but could not say that John Long was the man who was talking to defendant when he asked for his torch, nor could he say that John Long was on the platform at any time that night. The witness did not recollect that after he got from under the car he said to defendant: "Stick to them, High, until I get my gun," but would not swear that he did not. If witness knew that he made that remark to defendant, he would admit it without hesitation. Witness did not remember that he was mad when he went to Herndon to borrow a pistol. His purpose in borrowing a pistol, as stated, was to be prepared for defense, and not to resent the implied charge of the hackmen that he was a "son of a bitch."

N. C. Harris, mayor of Tyler, was the next witness for the defense. He testified that the defendant was a regularly appointed and qualified special policeman, and was night watchman at the Kansas & Short Line depot, at the time that McDougald was killed. The witness produced and read as evidence for the defense the commission or appointment, and the oath, of the defendant as such special policeman and night watchman. By direction of the court he also read, as evidence for the defense, the following articles of the city ordinances:

Article 83. The passenger depots and platforms are made for the convenience of passengers, and for the carriers of passengers or baggage. It shall not be lawful for such carriers of such passengers or baggage, carriage or omnibus drivers, hackmen or draymen, or hotel drummers to crowd or go upon such platform for the purpose of drumming or soliciting passengers or customers; and it is hereby made their duty to abide by the regulations prescribed by the said depot masters, and yield obedience to all reasonable and proper regulations for the maintenance of good order at and about the depots.

Article 84. The said depot masters and operators shall have authority to suppress all unusual or unnecessary noise, confusion and disorderly conduct of any person at or about said depots, and to arrest all persons committing a breach of this ordinance, or any existing ordinance of the city of Tyler, and have them tried before the mayor, and upon conviction shall be fined

not less than three dollars nor more than twenty-five dollars, or imprisonment for not more than ten days, or both.

The defense closed.

John Jessup was the first witness called by the State in rebuttal. He testified that he first saw the defense witness Bob Wombledoff, three or four minutes after the shot was fired, at which time Wombledoff came through the depot door to the platform, and said to defendant: "Stand your ground, High; I will get my gun, and we will fix them." The witness did not speak to Wombledoff on that night. He did not run up the platform with or without other hackmen, and say to Wombledoff or anybody else: "We will not allow any railroad son of a bitch to shoot us." To the witness it appeared impossible for Wombledoff to have been under the baggage car when the shot was fired, and to have come from under it, gone into the depot and come back to the platform, by the time that he saw him.

Bob Jessup testified, for the State, in rebuttal, that, just after the shot was fired, Wombledoff stepped to the platform from the inside of the depot, and exclaimed: "Stand your ground, High, and we will do them up! Wait till I get my gun, and we will be with them." Not more than half a minute had then elapsed since the shooting, and Wombledoff could not have been under the baggage car when the shot was fired and by that time have gone into the depot and thence to the platform.

J. E. Shook testified, for the State, that he was a passenger on the Kansas & Gulf Short Line Railroad on the night of the shooting, and got off the train at the depot about the time the shot was fired. As the train slowed up, a man exclaimed: "D—n you, don't shove me!" As witness stepped off the train the remark was repeated, and one man struck another man and knocked him against the car, but did not knock him down. The stricken man then drew a pistol and fired. The shot was fired within a minute after the train stopped.

John McCullers testified, for the State, in rebuttal, that he was a member of the Tyler police force at the time of the shooting. He reached the depot soon after the shooting, and found the defendant in the custody of Policeman Finch. Defendant showed the witness a tooth which he took from his pocket. The witness examined that tooth and did not think, judging from its appearance, that it had been recently knocked out or extracted from a mouth. It looked to the witness like

an old corner tooth that had been carried in the pocket for a considerable time. Defendant told the witness that McDougald knocked that tooth out of his mouth on that night.

Cross examined, the witness said that he judged the tooth to be a corner tooth because it was an extraordinarily long one. Witness did not look into the defendant's mouth. Witness's examination of the tooth as the defendant held it in his hand was not a critical one, but he thought from that examination that it had not recently been in a mouth. Defendant did not propose to witness to look into his mouth, nor did the witness offer to do so. Witness did not observe any bruise on the defendant's lip, nor any other indication of a recent blow. When the defendant exhibited the tooth to witness, witness suspected a fraud and paid no particular attention to it.

On his re-direct examination, the witness said that the defendant had a wife, son and two daughters, but, about the time or just before the shooting, was living with a Mrs. Stewart, who was reputed to be, and who had pleaded guilty in the police courts of being, a common prostitute.

D. Y. Gaines testified, for the State, that he was in charge of the Smith county jail when defendant was placed therein after the shooting of McDougald. On the morning after he was placed in jail defendant showed the witness a tooth which he said McDougald knocked out of his mouth. Witness could not tell from the appearance of that tooth whether it was recently or long ago knocked out, or whether it was knocked out or drawn out. He could see no indications of a recent blow on the lips of the defendant. His lips were neither bruised nor swelled, and witness thought that the lips of a man, soon after a blow on the mouth severe enough to knock out a tooth, would necessarily be both swelled and bruised. Cross examined, the witness said that, when defendant showed him the tooth, he, defendant, was in the cage, and the witness was on the outside of the cage, about a foot distant. It was light enough at the cage for witness to see well. A tooth might possibly be knocked out of a man's mouth without the lips being touched. The witness, however, was not an expert in knocking out teeth, and could not be positive about it.

The State closed.

J. H. Henderson and J. B. Hanks were the final witnesses on the trial. Henderson testified, for the defense, in substance, that he saw the defendant a very short time after the shooting,

when the defendant exhibited his mouth. The lips were much bruised, a tooth was knocked out, and the mouth was full of blood. He also showed witness a tooth which he said was knocked out of his mouth. Hanks testified that, on the morning after the shooting, he visited defendant in jail, when defendant showed him a tooth, and the place in the mouth from where it had been recently knocked. Defendant's lips were bruised, cut and ragged. The tooth showed, by adhering pieces of gum, that it had been recently and violently torn or knocked from a mouth.

*John M. Duncan* and *N. W. Finlay*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. "Manslaughter is voluntary homicide committed under the immediate influence of sudden passion arising from an adequate cause, but neither justified or excused by law." (Penal Code, art. 593.) Two of the adequate causes enumerated in our statute as being sufficient to reduce a homicide from murder to manslaughter are, "first, an assault and battery by the deceased causing pain or bloodshed; and, second, a serious personal conflict in which great injury is inflicted by the person killed by means of weapons or other instruments of violence, or by means of great superiority of personal strength, although the person guilty of the homicide were the aggressor, provided such aggression was not made with intent to bring on a conflict and for the purpose of killing." (Penal Code, art. 597.) And it is expressly declared that "an assault and battery so slight as to show no intention to inflict pain or injury" is not an adequate cause. (Penal Code, art. 596.)

But a homicide is permitted by law in necessary self defense, when inflicted for the purpose of preventing (among other offenses) murder or maiming, or serious bodily injury; and the only qualification prescribed is "that the attack upon the person of an individual, in order to justify homicide, must be such as produces a reasonable expectation or fear of death or some serious bodily injury." (Penal Code, art. 574.) A defendant so attacked is neither bound to retreat nor to resort to any other means before slaying his assailant. (Hunnicutt v. The State, 20 Texas Ct. App., 634; Williams v. The State, 22 Texas Ct. App., 497; Lee v. The State, 21 Texas Ct. App., 241; State v. Burke, 30 Iowa, 331.)

But where a necessarily deadly weapon be not used by the assailant in making the attack, it oftentimes becomes a nice if not difficult matter to properly determine the rights of the defendant as between manslaughter upon the one hand and self defense upon the other. As, for instance, in this case where the attack and injury were by the fists of the deceased, with intention of inflicting a beating upon defendant. If the assault and battery in such a case is so slight as to show no intention to inflict pain or injury, then to kill the assailant would be murder; if pain, bloodshed or great bodily injury be inflicted, then to kill the assailant will be either manslaughter or justifiable self defense. Mr. Wharton says, "if such intended beating is of a character to imperil life, or to maim, then the intent is felonious and the assailed is excused in taking life when necessary to repel the assault. On the other hand, the killing of the assailant under such circumstances, the design of the assailant being to beat, is not murder, and at the highest is manslaughter." (Whart. on Hom., 2 ed., sec. 480.) It will be noticed that he limits self defense which would excuse "to *imperil life* or to maim," and not to an attack which might produce serious bodily injury, with or without imperiling life.

We are of opinion the correct doctrine is more fully and lucidly expressed by the Supreme Court of Pennsylvania in the case of The Commonwealth v. Drum, 53 Pennsylvania State, 1, than in any authority to which we have access, and it occurs to us that the following excerpts are peculiarly in harmony with our statutes upon the subject. Justice Agnew says: "The act of the slayer must be such as is necessary to protect the person from death or great bodily harm, and must not be entirely disproportioned to the assault made upon him. If the slayer use a deadly weapon, and under such circumstances as the slayer must be aware that death will be likely to ensue, the necessity must be great and must arise from imminent peril of life or great bodily injury. If there be nothing in the circumstances indicating to the slayer at the time of his act that his assailant is about to take his life or do him great bodily harm, but his object appears to be only to commit an ordinary assault and battery, it will not excuse a man of equal or nearly equal strength in taking his assailant's life with a deadly weapon. In such a case it requires a great disparity of size and strength on the part of the slayer, and a very violent assault on the part of his assailant, to excuse it. The disparity on the one

hand and the violence on the other must be such as to convince the jury that great bodily harm, if not death, might have been suffered unless the slayer had thus defended himself, or that the slayer had reasonable ground to think it would be.   *   *   * The true criterion of self defense in such a case is whether there existed such a necessity for killing the adversary as required the slayer to do it in defense of his life, or in the preservation of his person from great bodily harm. If a man approaches another with an evident intention of fighting him with his fists only, and where under the circumstances nothing would be likely to eventuate from the attack but an ordinary beating, the law can not recognize the necessity of taking life with a deadly weapon. In such a case (pain or bloodshed supervening) it would be manslaughter.   *   *   *   But a blow or blows are just cause of provocation, and, if the circumstances indicated to the slayer a plain necessity of protecting himself from great bodily injury, he is excusable if he slays his assailant in an honest purpose of saving himself from this great harm." (See Kingen v. The State, 45 Ind., 519; also reported in Horrigan & Thomp. Self Defense, 183.) And in such a case, as in all cases of resistance to violence to the person, the assailed party is not bound to retreat, and the reasonable expectations and appearances of serious bodily injury must be judged of from his standpoint.

Article 570 of our Penal Code, which defines the circumstances under which homicide is permitted by law in the prevention of other felonies, "comprises all cases in which from the acts of the assailant, or his words coupled therewith, it reasonably appears that his purpose or intent is to murder, ravish, rob, maim, disfigure, castrate, *or do other serious bodily injury* to the assailed party. In such case the assailed party may lawfully kill the assailant while he is committing the offense or injury, or when he has done some act evidently showing his intent to commit it, and the assailed party need not resort to other means of prevention." (Willson's Crim. Stats., sec. 970.) One important condition annexed to the right of self defense by that article (570) is that the killing must take place before the offense committed by the party killed is actually completed. (Subdiv. 3.)

Now to apply the foregoing principles of law to the facts as they are exhibited in the record before us, we only recount in substance the salient features of the evidence.

Defendant, an officer at the depot, and empowered with au-

thority to do so, ordered deceased to get off the platform. He also put his hand against the deceased to push or shove him back. Deceased cursed him—told him not to shove him or he would "knock a lung out of him." Defendant cursed back, told deceased if he got upon the platform he would push him off. Deceased shook his fist in defendant's face, and, as defendant pushed or knocked it away, deceased struck him a severe blow in the mouth, which knocked out "a corner tooth" and sent him staggering several feet against the side of a car which prevented his falling entirely upon the ground. As soon as defendant could recover himself and straighten up, he drew his pistol and immediately fired the fatal shot at deceased, who was within a few feet, standing with his fist doubled and his arm drawn back as though intending to strike again. These, in brief, are all the facts necessary to illustrate what in our opinion was an important and material failure or omission in the charge of the court upon the law of self defense.

According to defendant's theory, he was struck, bruised, maimed, and to all intents and purposes stricken down. Actual and serious bodily injury has been inflicted upon him. Defendant has in fact suffered mayhem of his body, whether the deceased intended such consequences or not; for to knock out a front tooth is to maim him. (2 Bouv. L. Dic , "mayhem;" 2 Bish. Crim. Law, 7 ed., sec. 1001.) Smarting under the injury, he recovered himself, sees his antagonist to all appearances prepared, ready, and in the act of repeating the injury. He draws and fires. From the beginning to the end the whole transaction occurs in a very few seconds. It may be said to be almost instantaneous. When defendant recovers himself from the effects of the blow, the combat is not over, for deceased to all appearances has squared himself to deliver another such blow. Can it be said he has completed his offense? It may not reasonably appear so to defendant. From his standpoint it may be reasonable that deceased has not completed his offense, but is in the very act and has the ability of inflicting the same or greater injury, and, *"dum fervet opus,"* the shot is fired. This is defendant's theory of the case. We are not expressing our opinion as to the evidence.

Now, if defendant had already received serious bodily injury at the hands of deceased, and it reasonably appeared to him from the acts and conduct of deceased that the combat was not over, that he was about to receive additional bodily injury

from deceased, that deceased had the ability to inflict the injury, that the danger was threatening and imminent, and, under such circumstances and so believing, he shot and killed deceased, then, under the law as above announced and under our statute, he would be justifiable upon the ground of his necessary self defense, and if the jury should so believe from the evidence, it would be their duty to acquit him. In the otherwise able exposition of self defense announced by the learned judge, this phase of the law, which in our opinion was manifestly called for by the facts, if as above stated, was not submitted in plain and affirmative terms.

Again, defendant's counsel asked the court to instruct the jury as follows: "The jury are charged that a person has the right to take the life of another in order to prevent himself from being maimed or disfigured, and the killing may take place at any time while the offender is mistreating him with violence, though the maiming or disfiguring may have been already completed;" and error is assigned upon the refusal thereof, as also upon the refusal of the court to submit any instructions upon the law of maiming in connection with defendant's right of self defense. The instruction, though sufficient to call the court's attention to the matter of maiming, was not legally correct with reference to the facts as to the term "*disfigured*," there being no evidence of *disfiguring* as defined in our statute. (Penal Code, art. 509.)

"To maim is to wilfully and maliciously cut off or otherwise deprive a person of the hand, arm, finger, toe, foot, leg, nose, or ear; to put out an eye, or in anyway to deprive a person of any other member of his body." (Penal Code, art. 507; Willson's Crim. Stat., sec. 877.)

"To constitute the offense of maiming, the act must be done both wilfully and maliciously. A *wilful* act is one committed with an evil intent, with legal malice, and without legal justification. A *malicious* act is one committed in a state of mind which shows a heart regardless of social duty and fatally bent on mischief; a wrongful act, intentionally done without legal justification or excuse." (Bowers v. The State, 24 Texas Ct. App. 542.)

We have seen that to deprive one of a front tooth is to maim him as understood at common law. The "front tooth" is not, however, used in terms in our code as a "member of the body," but we think it clear that it comes within the import of the

word "member" as used in the code and in common accepta-tion, and, under the authorities cited above, we believe that as to "the front tooth" the court may well assume that it is "a member" of the body, without submitting the question as a matter of fact to the jury. (Slattery v. The State, 41 Texas, 619, appears to hold otherwise.) It would be, however, in this case a question of fact, to be found by the jury, whether a *"corner tooth"* was a *"front tooth."*

It may be said that deceased did not, perhaps, intend to *"maim"* defendant, and that therefore the act was not "wil-fully and maliciously" done. But it is statutory that "the in-tention to commit an offense is presumed whenever the means used is such as would ordinarily result in the commission of the forbidden act" (Penal Code, art. 50); and it is elementary that "a man is always presumed to intend that which is the necessary or even probable consequence of his acts, unless the contrary appears." (Willson's Crim. Stat., sec. 109.)

In cases of maiming it is provided that the killing will be justifiable if done in its prevention, and "the homicide may take place at any time while the offender is *mistreating with violence* the person injured, though he may have completed the offense." (Penal Code, art. 570, sub div. 6.) Was the deceased *mistreating* the defendant *with violence* when the latter fired the fatal shot? This was a matter of fact to be found by the jury under appropriate instructions from the court. We have already stated the facts in another connection. The tooth had already been knocked out, if at all, when defendant fired. The maiming was therefore complete. If deceased had his fist doubled and arm drawn back to again strike, was attemping to strike, and had an immediate intention coupled with the ability to strike, he was committing an assault (Penal Code, art. 484), the test being, was there in fact a present purpose of doing an injury? (Willson's Crim. Stat., sec. 811.) To commit an as-sault upon a party is certainly to "*mistreat*" him. But an assault merely is not "*violence*," and, as we have said, there must be "*mistreating with violence.*" Under the facts of this case the question was, had there been any cessation of violence by the deceased? The blow, the injury, the fall, the recovery, the doubling of the fist and drawing back to strike, the drawing and the firing of the pistol, all appear to have been instanta-neous acts of the transaction, with scarcely a pause even or let up in the continuity of the acts. In such a state of case it was

for the jury to determine from the facts whether there was any cessation of active hostilities and violence. We are of the opinion the court also erred in declining to submit the law of maiming in connection with defendant's right of self defense.

It is questionable if the *corpus delicti* is sufficiently established. It is certainly not as definitely proven as it might have been by the testimony of the physician who examined the wound and ministered to the dying man. The deceased was shot between eight and nine o'clock Sunday night, and died about six o'clock the following Monday evening; he was attended by physicians, died at a physician's house, yet no physician or other person who attended him was introduced as to the nature, extent or location of the wound, or as to whether it was a bullet wound, nor as to what caused his death. John Jessup, a companion of deceased, testified that "Louis was shot at the Kansas & Gulf Short Line depot; he is dead; he died from being shot; died at Doctor Hicks's office; was shot in the stomach; defendant shot him." He also testified that he was at Doctor Hicks's office a few minutes after the deceased was shot, and that "the next time I saw him was about three or four o'clock Monday evening, and then again a few minutes after six; he died at six." This shows that he was not present when the deceased died. This witness does not testify that he ever saw the wound, nor as to its character, whether it entered the cavity or whether it was at all serious.

Bob Jessup, also a hack driver, and a companion of the deceased, testified: "I knew Louis McDougald; he is dead; Mr. High shot him; I suppose that was the cause of his death." This is the whole of the testimony touching the question of the cause of the death of Louis McDougald, and no excuse is shown why other evidence was not produced on that point.

No other questions are deemed of sufficient importance to require discussion. For the errors discussed, as to the charge of the court, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered December 8, 1888.